FILED BY _____ D.C.

FEB 1 2 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

No. _20 - 2228 JJo_

**UNITED STATES OF AMERICA**

**vs.**

**JUAN RIBAS DOMENECH,**
**JOSE VICENTE GOMEZ AVILES, and**
**FELIPE MONCALEANO BOTERO,**

   **Defendants.**
_____/

## CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?   ___Yes  _x_  No

2.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?   ___Yes  _x_  No

                    Respectfully submitted,

                    ARIANA FAJARDO ORSHAN
                    UNITED STATES ATTORNEY

        BY:  _____ / For _____
                    ALEXANDER KRAMER
                    TRIAL ATTORNEY, CRIMINAL DIVISION
                    DEPARTMENT OF JUSTICE
                    Court ID No. A5502240
                    99 NE 4th Street
                    Miami, Florida 33132-2111
                    Tel: (202) 768-1919

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| JUAN RIBAS DOMENECH, | ) Case No.  20-2228 JJO |
| JOSE VICENTE GOMEZ AVILES, and | ) |
| FELIPE MONCALEANO BOTERO | ) |
| | ) |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____2014 - 2016_____ in the county of _____Miami-Dade_____ in the

_____Southern_____ District of _____Florida_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to launder bribery proceeds in U.S. currency through bank accounts in order to conceal the nature, location, source, ownership, and control of the proceeds |

This criminal complaint is based on these facts:

[see attached affidavit]

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Jeff LaMirand, IRS-CI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  2/12/20
_____
*Judge's signature*

City and state:  Miami, FL

Hon. John J. O'Sullivan, U.S. Magistrate Judge
*Printed name and title*

I, JEFFREY LAMIRAND, being duly sworn, depose and state as follows:

1.   I am a Special Agent with the Internal Revenue Service, Criminal Investigation ("IRS-CI"). I have been an IRS-CI Special Agent since on or about July 9, 2010. My responsibilities include the investigation of possible criminal violations of the Internal Revenue Laws (Title 26, United States Code), the Bank Secrecy Act (Title 31, United States Code), the Money Laundering Control Act (Title 18, United States Code), and other related offenses. I hold a bachelor's degree in accounting and finance from Michigan State University. I also hold a Juris Doctor degree from Chicago-Kent College of Law. I am a certified public accountant (CPA) licensed to practice in the State of Virginia and an attorney licensed to practice in the State of Illinois. On or about February 8, 2014, I became a full-time member of the Global Illicit Financial Team ("GIFT"), a multi-agency task force within IRS-CI whose mission is to investigate large, international third-party money laundering cases. I am fluent in Spanish. As part of my work at the IRS, I have received training regarding fraud and white collar crimes, including the Foreign Corrupt Practices Act ("FCPA") and money laundering.

2.   I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, witness interview notes, my participation in witness interviews, and conversations with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

3.   Your affiant has participated in a criminal investigation into **JUAN RIBAS DOMENECH,** an Ecuadorian citizen who currently resides in Miami-Dade County, Florida; **FELIPE MONCALEANO BOTERO,** a Colombian citizen; and **JOSE VICENTE GOMEZ AVILES,** an Ecuadorian citizen who currently resides in Miami-Dade County, Florida. Based on the evidence gathered through this investigation, there is probable cause to believe that from in or around 2014 through at least in or around 2016, in the Southern District of Florida and elsewhere, **JUAN RIBAS DOMENECH, FELIPE MONCALEANO BOTERO,** and **JOSE VICENTE GOMEZ AVILES,** together with others, engaged in a bribery scheme that violated

1

United States law and Ecuadorian bribery law, and from in or around 2014 through in or around 2016, **JUAN RIBAS DOMENECH**, **FELIPE MONCALEANO BOTERO**, and **JOSE VICENTE GOMEZ AVILES**, together with others, conspired to launder monetary instruments, in violation of Title 18, United States Code, Section 1956(h), that is: knowing that the property involved in a financial transaction represented the proceeds of the unlawful bribery scheme, conducted and attempted to conduct such a financial transaction which in fact represented the proceeds of specified unlawful activity, knowing that the transaction was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

4.    Bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2 and bribery of a public official of Ecuador, a felony violation of the penal code of the Republic of Ecuador, are specified unlawful activities, pursuant to Title 18, United States Code, Sections 1956(c)(7)(B)(iv) and (D).

## THE U.S. FOREIGN CORRUPT PRACTICES ACT (FCPA)

5.    Your affiant is aware that the FCPA was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for or with, or directing business to any, person. 15 U.S.C. §§ 78dd-1, *et seq.*

6.    The FCPA prohibits "domestic concerns," which include residents of the United States, from making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value, to a foreign official or to a person, while knowing that all or part of such money or thing of value would be and had been offered, given, or promised to a foreign official, for purposes of (i) influencing acts or decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do or omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; or (iv) inducing such foreign official to use his influence with a foreign government or agencies or instrumentalities thereof to affect or influence acts or decisions of such government or

agencies or instrumentalities, in order assist the domestic concern to obtain or retain business for or with, or directing business to, any person. 15 U.S.C. § 78dd-2(a) and (h)(1)(A).

## THE ECUADORIAN PENAL CODE
## RELATING TO BRIBERY OF A PUBLIC OFFICIAL

7. From my review of an English translation of the Penal Code of the Republic of Ecuador (the "Ecuadorian Penal Code") in effect from at least in or around February 2014 through the present, the penal code contains the following relevant provision relating to bribery of a public official, as translated from Spanish:

a. Article 280 [Bribery]: Any public servant and any person that acts on behalf of a state power within any of the State's institutions, listed in the Constitution of the Republic, that receives or accepts, directly or through a third party, an improper economic benefit, or any other type of benefit for himself or for a third party, either to carry out, omit, expedite, delay or condition matters related to his or her functions, shall be punished with a term of imprisonment of one to three years. If the public servant executes an act or fails to carry out the proper act, he or she shall be punished with a term of imprisonment of three to five years. If the conduct described is carried out in order to commit another crime, the public servant shall be punished with a term of imprisonment of five to seven years. Any person who in any way offers, gives or promises any public servant a donation, gift, promise, advantage, or improper economic benefit in order for such servant to carry out, omit, expedite, delay, or condition matters related to his or her functions, or in order to commit a crime, shall be punished with the same penalties issued against public servants.

## RELEVANT ENTITIES AND INDIVIDUALS

8. Seguros Sucre S.A. ("Seguros Sucre") was the state-owned insurance company of Ecuador. Seguros Sucre was controlled by the government of Ecuador and performed a function that Ecuador treated as its own, and thus was an "instrumentality" of the Ecuadorian government as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

9. **JUAN RIBAS DOMENECH**, one of the defendants, was a citizen of Ecuador who served as the Chairman of Seguros Sucre and an advisor to the President of Ecuador from at least in or

3

about 2013 through at least in or about 2017. **JUAN RIBAS DOMENECH** was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A). **JUAN RIBAS DOMENECH** maintains residence in Miami-Dade County, Florida.

10. **FELIPE MONCALEANO BOTERO**, one of the defendants, was a Colombian citizen who was an executive and shareholder of Insurance Broker's Colombian-based subsidiaries from in or around at least 2013 through in or around 2019.

11. "Insurance Broker," a company whose identity is known to your affiant, was a reinsurance broker and risk adviser based in the United Kingdom. Insurance Broker wholly- or majority-owned subsidiaries based in Colombia through which it acted as a broker for insurance companies in Colombia and Latin America, assisting them to reinsure their risks in the local and international (re)insurance markets. Seguros Sucre was a client of Insurance Broker. Insurance Broker conducted its business with Seguros Sucre through its Colombian based subsidiaries and other wholly- or majority-owned entities.

12. **JOSE VICENTE GOMEZ AVILES**, one of the defendants, was an Ecuadorian citizen, a U.S. lawful permanent resident, and one of the owners of Introducer Company. **JOSE VICENTE GOMEZ AVILES** maintained residence in Miami-Dade County, Florida. **JOSE VICENTE GOMEZ AVILES** was a "domestic concern" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A).

13. "Introducer Company," a company whose identity is known to your affiant, was a Panama registered company that operated as a reinsurance introducer. In that capacity, Introducer Company helped companies obtain and retain contracts with Seguros Sucre in exchange for receiving a commission.

14. "Intermediary Company 1," a company whose identity is known to your affiant, was a company formed and registered in Panama. Intermediary Company 1 held a brokerage account with a bank in Switzerland (the "Intermediary Company 1 brokerage account"). **JOSE VICENTE GOMEZ AVILES** controlled Intermediary Company 1 and could direct payments into and out of the Intermediary Company 1 brokerage account.

15. "Intermediary Company 2" a company whose identity is known to your affiant, was a company formed and registered in the Cayman Islands. Intermediary Company 2 held multiple accounts with a bank in the United States, at least three of which were used to facilitate transfers of cash and securities

4

between accounts identified herein (the "Intermediary Company 2 accounts").

16. "Intermediary Company 3," a company whose identity is known to your affiant, was a company formed and registered in Panama. Intermediary Company 3 held a brokerage account with a bank in Switzerland (the "Intermediary Company 3 brokerage account"), which was held for the benefit of **JUAN RIBAS DOMENECH** and received and held a portion of the bribe payments from **JOSE VICENTE GOMEZ AVILES** and **FELIPE MONCALEANO BOTERO** to **JUAN RIBAS DOMENECH.** The Intermediary Company 3 brokerage account was largely funded by Intermediary Company 1.

17. "Financial Advisor," an individual whose identity is known to your affiant, was a dual United States and Ecuadorian citizen, a relative of **JOSE VICENTE GOMEZ AVILES**, and a financial advisor at a financial services firm who had authority to cause transfers into and from the Intermediary Company 1 brokerage account, Intermediary Company 2 accounts, and Intermediary Company 3 brokerage account. Financial Advisor was a "domestic concern" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A), and a "United States person" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(i).

## OVERVIEW OF THE SCHEME TO LAUNDER BRIBERY PROCEEDS

18. As described in greater detail below, **JUAN RIBAS DOMENECH**, while acting as Chairman of Seguros Sucre, received bribes from **JOSE VICENTE GOMEZ AVILES** and **FELIPE MONCALEANO BOTERO**, in exchange for using his position to assist **JOSE VICENTE GOMEZ AVILES** and others to obtain and retain business for Insurance Broker with Seguros Sucre, in violation of the FCPA and Ecuador's law against bribery of a public official.

19. In order to conceal and disguise the bribe payments, **JUAN RIBAS DOMENECH, JOSE VICENTE GOMEZ AVILES**, and **FELIPE MONCALEANO BOTERO**, together with others, caused bribery proceeds of at least approximately $1,004,000 to be laundered through bank accounts in the United States for the benefit of **JUAN RIBAS DOMENECH** and others, in violation of U.S. money laundering laws.

## THE BRIBERY AND MONEY LAUNDERING SCHEME

20. From my review of emails, contracts, documents, bank records, witness interviews and from my participation in this investigation, I have learned, among other things, the following:

21.   From at least in or around 2013 through at least in or around 2017, **JUAN RIBAS DOMENECH**, as Chairman of Seguros Sucre, had influence relating to the award of Seguros Sucre contracts.

22.   In or around June 2013, Insurance Broker obtained reinsurance business from Seguros Sucre to be the reinsurance broker for the Ecuadorian Ministry of Defense ("MOD") for the period 2013 through 2014.

23.   In or around late 2013, Seguros Sucre informed Insurance Broker that Seguros Sucre might not renew Insurance Broker's MOD reinsurance policy.

24.   In or around early 2014, **FELIPE MONCALEANO BOTERO** approached the owners of Introducer Company, including **JOSE VICENTE GOMEZ AVILES,** about helping Insurance Broker retain the contract to provide reinsurance for MOD. **FELIPE MONCALEANO BOTERO** and the other owner of Introducer Company arranged meetings with Seguros Sucre officials, including **JUAN RIBAS DOMENECH**.   Following these meetings, Seguros Sucre agreed to retain Insurance Broker's MOD policy.

25.   In or around May 2014, after Seguros Sucre agreed to maintain Insurance Broker's MOD policy, Insurance Broker approved Introducer Company as an introducer.   Insurance Broker approved the payment of any future commissions to Introducer Company's Panama bank account given that Introducer Company was a Panama-based company.

26.   In or around September 2014, Insurance Broker and Introducer Company reached an agreement whereby Insurance Broker agreed to pay Introducer Company $1.8 million commission for the MOD 2013 through 2014 contract and an 8% commission on the MOD 2014 through 2015 contract.

27.   The commission payments to Introducer Company, however, were not made to its approved Panama bank account. Rather, at **JOSE VICENTE GOMEZ AVILES**'s request and with **FELIPE MONCALEANO BOTERO**'s approval, payments totaling approximately $10.8 million in commissions to Introducer Company were made to accounts in the United States, Panama, and Switzerland that were not held in the Introducer Company's name but rather in the name of Intermediary Company 1 and other entities.

28.   Specifically, from on or about October 2, 2014 to on or about October 28, 2016, a U.S. bank account held by Insurance Broker's Colombian subsidiary made at least eleven wire transfers totaling at least approximately $6,510,735 to

6

Intermediary Company 1's brokerage account in Switzerland. These payments were Introducer Company's commissions from the reinsurance policies with Seguros Sucre to insure MOD and other state-owned entities of Ecuador.

29.   In or around February 2015, **JOSE VICENTE GOMEZ AVILES** and **FELIPE MONCALEANO BOTERO** caused to be created a false, backdated contract between Insurance Broker's Colombian-based subsidiary and Intermediary Company 1, signed by **FELIPE MONCALEANO BOTERO**, which was sent to Intermediary Company 1's Swiss bank to justify the payments sent by Insurance Broker to Intermediary Company 1.

30.   A portion of the commission payments from Insurance Broker to Introducer Company for the Seguros Sucre contracts were funneled to **JUAN RIBAS DOMENECH** and others close to him through transactions involving multiple intermediary companies and securities transfers.   Specifically, Intermediary Company 1 brokerage account, which was funded almost exclusively with Insurance Broker commission payments to Introducer Company, transferred at least approximately $682,000 in cash and $1,975,000 worth of securities ($2,657,000 total value) to Intermediary Company 3 brokerage account, which was held for the benefit of **JUAN RIBAS DOMENECH**.   All but one of these transfers occurred though U.S.- based accounts held by Intermediary Company 2. Furthermore, Intermediary Company 1 and Intermediary Company 3 Swiss-based brokerage accounts funneled through Intermediary Company 2 U.S.-based accounts at least approximately $750,000 into U.S.-based accounts held by **JUAN RIBAS DOMENECH** and at least approximately $254,000 into U.S.-based accounts held by **JUAN RIBAS DOMENECH's** relatives.

31.   On or about March 23, 2016, Financial Advisor exchanged emails with his assistant regarding Intermediary Company 1 payments made to **JUAN RIBAS DOMENECH** between in or around November 2014 and January 2016 and those still pending. The correspondence references **JUAN RIBAS DOMENECH** by initials and by name and also references **JUAN RIBAS DOMENECH** as linked to Intermediary Company 3.

**A.   November 2014 Transfer of $400,000 for Benefit of JUAN RIBAS DOMENECH**

32.   On or about November 3, 2014, **JOSE VICENTE GOMEZ AVILES** caused the Intermediary Company 1 brokerage account to transfer approximately $400,000 to the Intermediary Company 3 brokerage account, which was an account used to receive and hold funds for the benefit of **JUAN RIBAS DOMENECH**.

7

**B.     December 2014 Payment of $300,000 to JUAN RIBAS DOMENECH**

33.   On or about December 8, 2014, Intermediary Company 1's brokerage account transferred approximately $319,777 of Introducer Company's commissions on the MOD contracts to one of the Intermediary Company 2 accounts through the purchase of a security.

34.   On or about December 18, 2014, the same Intermediary Company 2 account wired $300,000 of the $319,777 to a U.S. based bank account in the name of **JUAN RIBAS DOMENECH**.

**C.     January 2015 Payment of $282,000 to Intermediary Company 3**

35.   On or about December 9, 2014, while in the Southern District of Florida, **JOSE VICENTE GOMEZ AVILES** sent an email to Financial Advisor, directing him to transfer $282,000 to "el amigo."

36.   On or about December 12, 2014, Financial Advisor caused the Intermediary Company 1 brokerage account to transfer approximately $310,158 to one of the Intermediary Company 2 accounts through the purported purchase of a security.

37.   On or about January 15, 2015, Financial Advisor caused the Intermediary Company 2 account to wire approximately $282,000 of the $310,158 to the Intermediary Company 3 brokerage account.

**D.    June 2015 Payment of $100,000 to JUAN RIBAS DOMENECH**

38.   On or about June 8, 2015, Financial Advisor caused the Intermediary Company 3 brokerage account to transfer approximately $106,706 back to one of the Intermediary Company 2 accounts through the purchase of a security.

39.   On or about June 8, 2015, Financial Advisor caused the same Intermediary Company 2 account to wire $100,000 of the $106,706 to a U.S.-based bank account in the name of **JUAN RIBAS DOMENECH**.

**E.    March and April 2016 Payment of $104,000 to JUAN RIBAS DOMENECH's Relatives**

40.   From on or about March 31, 2016 to on or about April 11, 2016, Financial Advisor caused one of the Intermediary Company 2 accounts to make three wire transfers to the U.S.

8

based accounts in the names of relatives of **JUAN RIBAS DOMENECH** that totaled approximately $104,000.

41. First, on or about March 31, 2016, Financial Advisor caused the Intermediary Company 2 account to wire approximately $29,000 to a U.S.-based bank account in the name of a relative of **JUAN RIBAS DOMENECH**.

42. Second, on or about April 11, 2016, Financial Advisor caused the Intermediary Company 2 account to wire approximately $65,000 to a U.S.-based bank account in the name of a second relative of **JUAN RIBAS DOMENECH**.

43. Third, on or about April 11, 2016, Financial Advisor caused the Intermediary Company 2 account to wire approximately $10,000 to a U.S.-based bank account in the name of a third relative of **JUAN RIBAS DOMENECH**.

44. On or about May 12, 2016, Financial Advisor caused the Intermediary Company 3 brokerage account to transfer $104,000 in securities to the Intermediary Company 2 account in order to reimburse Intermediary Company 2 for making approximately $104,000 in transfers to **JUAN RIBAS DOMENECH's** relatives.

**E.   May-August 2016 Emails Regarding "Loans" from FELIPE MONCALEANO BOTERO to JUAN RIBAS DOMENECH and Another Seguros Sucre Official**

45. Between in or around May 5, 2016 and June 6, 2016 **FELIPE MONCALEANO BOTERO** sent emails to **JOSE VICENTE GOMEZ AVILES** and the other owner of Introducer Company discussing repayment owed to **FELIPE MONCALEANO BOTERO** for $200,000 "loaned" to [first name of a second Seguros Sucre executive] with the agreement to be repaid from the MOD commission. **FELIPE MONCALEANO BOTERO** also referenced the "1%" for [first name of a second Seguros Sucre executive].

46. On or about August 8, 2016, **FELIPE MONCALEANO BOTERO** emailed **JOSE VICENTE GOMEZ AVILES** and the other owner of Introducer Company referencing $80,000 that he had transferred from his personal funds for "Termopinchincha," which your affiant believes to be a reference to CELEC EP Termopinchincha, a business unit of the Ecuadorian public electric company and one of the entities in connection with which Insurance Broker received reinsurance business with Seguros Sucre. **FELIPE MONCALEANO BOTERO** further stated (translated from Spanish), "We need to find a way for me to get back this 80,000 plus the 200,000 that I transferred last year in order to transfer an

adjustment to Juan." Your affiant believes this to be a reference to **JUAN RIBAS DOMENECH**.

47. Based on the foregoing, specifically the transfers made from Intermediary Company 1 to Intermediary Company 2 and Intermediary Company 3 knowing that a portion of such money would be offered, given, or promised, directly or indirectly, to **JUAN RIBAS DOMENECH**, there is probable cause to believe that, from in or around 2014 through at least in or around 2016, **JOSE VICENTE GOMEZ AVILES**, a "domestic concern" under the FCPA, willfully and corruptly made use of the mails and means and instrumentalities of interstate commerce in furtherance of an offer and promise to make payments for the benefit of Ecuadorian officials, including **JUAN RIBAS DOMENECH**, for the purpose of corruptly influencing those officials in order to assist **JOSE VICENTE GOMEZ AVILES** in obtaining and retaining business for, and directing business to, himself, Introducer Company, **FELIPE MONCALEANO BOTERO**, and Insurance Broker, in violation of Title 15, United States Code, Section 78dd-2.

48. Based on the foregoing, and based on my review of the Ecuadorian Penal Code, there is also probable cause to believe that the bribery scheme conducted by **JUAN RIBAS DOMENECH**, **JOSE VICENTE GOMEZ AVILES**, and **FELIPE MONCALEANO BOTERO**, and others as described above, in which **JUAN RIBAS DOMENECH** received bribes from **JOSE VICENTE GOMEZ AVILES** and **FELIPE MONCALEANO BOTERO** in exchange for, among other things, obtaining and retaining contracts from Seguros Sucre, was an offense under, *inter alia*, Ecuadorian law prohibiting bribery of public officials.

49. Based on the foregoing, specifically the subsequent movement of a portion of the payments received by Intermediary Company 2 and Intermediary Company 3, directly or through securities transactions, from Intermediary Company 1, to accounts held in the name of or for the benefit of **JUAN RIBAS DOMENECH** or his relatives, there is also probable cause to believe that, in or around 2014, through at least in or around 2016, **JUAN RIBAS DOMENECH**, **JOSE VICENTE GOMEZ AVILES**, and **FELIPE MONCALEANO BOTERO** conspired with others to commit money laundering. Specifically, there is probable cause to believe that **JUAN RIBAS DOMENECH** conspired with **JOSE VICENTE GOMEZ AVILES** and **FELIPE MONCALEANO BOTERO**, and others, to launder bribery proceeds in U.S. currency through bank accounts, including bank accounts in the United States, in order to conceal the nature, location, source, ownership, and control of

the proceeds, in violation of Title 18, United States Code, Section 1956(h).

## CONCLUSION

Based on the foregoing, I believe that probable cause exists to issue a criminal complaint and arrest warrant charging **JUAN RIBAS DOMENECH, JOSE VICENTE GOMEZ AVILES,** and **FELIPE MONCALEANO BOTERO** with violating Title 18, United States Code, Section 1956(h).

Your affiant therefore respectfully requests that the Court enter a complaint for the foregoing violations and issue a warrant for the arrest of **JUAN RIBAS DOMENECH, JOSE VICENTE GOMEZ AVILES,** and **FELIPE MONCALEANO BOTERO.**

JEFFREY LAMIRAND
SPECIAL AGENT
INTERNAL REVENUE SERVICE

Sworn to before me this
12th day of February 2020

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA

11